UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIA GORETTI MYERS,

        Plaintiff,

v.                                 CASE NO.  8:10-CV-1987-T-17TGW

WINN-DIXIE STORES, INC.,
etc.,

        Defendant.

_____/


ORDER

This cause is before the Court on:


Dkt. 14    Motion for Partial Summary Judgment
Dkt. 17    Response

In Counts I and II, Plaintiff Maria Goretti Myers asserts a claim against Defendant Winn-Dixie Stores, Inc. for violation of the Americans with Disability Act of 1990, as amended, for failure to accommodate Plaintiff's reasonable request not to be placed at a store 25 miles away, and for wrongful termination of employment.  Plaintiff seeks the award of back pay and benefits, interest on back pay and benefits, front pay and future benefits, compensatory damages for emotional damages, other non-pecuniary losses, injunctive relief, and attorney's fees and costs.  In Count III, Plaintiff alleges that Plaintiff had a disability as defined by the Florida Civil Rights Act, that Defendant did not accommodate Plaintiff's reasonable request to not be placed at a store 25 miles away, and took adverse employment action against Plaintiff by terminating Plaintiff's employment.  Plaintiff seeks the award of back pay and benefits, interest on back pay and benefits, front pay and benefits, compensatory damages, pecuniary and non-pecuniary losses, the award of attorney's fees and costs and punitive damages.  In

Case No. 8:10-CV-1987-T-17TGW

Count IV, Plaintiff asserts a claim against Defendant under the Florida Civil Rights Act, alleging that Defendant perceived Plaintiff as having a disability, that Plaintiff's perceived impairments lasted and were expected to last longer than six months, and Defendant took an adverse employment action, termination, against Plaintiff due to a perceived disability.  Plaintiff seeks the award of back pay and benefits, interest on back pay and benefits, front pay and benefits, compensatory damages, pecuniary and non-pecuniary losses, attorney's fees and costs and punitive damages.

I.  Standard of Review

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

> The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are...irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted."  Id. at 249-50.

2

Case No. 8:10-CV-1987-T-17TGW

II.   Statement of Undisputed Facts

The Court considers the following material facts to be undisputed, and relies on the following facts only for the purpose of resolving the pending Motion for Partial Summary Judgment:

1.   Plaintiff Maria Goretti Myers was employed by Defendant Winn-Dixie Stores, Inc. from 1997 until September 22, 2009.   Plaintiff became a front-end manager on September  25, 2003   (Dkt. 14-2, p. 17).     At the time of Plaintiff's termination, Plaintiff was a front-end manager.

2.   The duties of a front-end manager include cash handling, customer service and "running the front," i.e.  "making sure all customers were taken care of, lines were down, taking care of the cashiers and baggers."  (Dkt. 14-2, p. 17).

3.   Plaintiff Myers developed interstitial cystitis in 2004, which caused intermittent bladder infections beginning in October, 2004.   Plaintiff testified that the bladder infections occurred every five weeks.   The bladder infections caused swelling, such that Plaintiff Myers needed to wear maternity clothes, which Plaintiff wore from October 2004 through November 2008.   (Dkt. 2, Complaint, pars. 15, 16, Dkt. 14-4, p. 18).  The condition also caused constant pain, (Dkt. 14-2, p. 36)  for which Plaintiff Myers was prescribed medication.  (Dkt. 14-2, pp. 6-9).   Plaintiff's medications included Percocet, fentanyl patch, thyroid medication, Klonopin and a smoking pill.    Plaintiff Myers testified that one of her kidneys is damaged, and as a result Plaintiff's ability to sit and drive is restricted due to chronic pain.  Plaintiff testified that Plaintiff can drive only 15 miles before severe pain.  (Dkt. 14-2, p. 92).  Plaintiff Myers further testified that Plaintiff has "leg seizures" periodically, resulting in weak and shaky legs.  (Dkt. 14-2, pp. 32-34).

3

Case No. 8:10-CV-1987-T-17TGW

4.    In the Complaint, Plaintiff includes the following factual allegations as to Plaintiff's claim for intentional discrimination:

17.  During approximately 2005, Plaintiff told the store manager she was going to apply for a promotion position which had become available.  The store manager told Plaintiff not to apply for it because she was "too sick."

18.  In or around September 2008, Plaintiff was out of work for three days due to having seizures.  The seizures caused her to feel sharp needle-like pains in her legs and her legs were very shaky due to weakness.  Upon returning to work, members of management made fun of the way Plaintiff walked due to the weakness in her legs.  Plaintiff complained to HR about the harassment, but nothing was done to stop it.

19.  In about November 2008, even though Plaintiff weighed only 130 lbs. Because she looked pregnant due to her bladder disorder, the manager ordered size 2X shirts for her. Plaintiff complained to  HR that this was done to make fun of her, and she was permitted to continue to continue to wear maternity clothes.

20.  Plaintiff was out of work on Family Medical Leave ("FML") from approximately February 4, 2009, through April 6, 2009, due to the bladder disorder.  During this time, Plaintiff had problems with a pace maker which had been placed into her bladder during October, 2007.

21.  In about March, 2009, while Plaintiff was on FML, Defendant replaced Plaintiff with an employee who had no experience at being a front-end manager and had only recently been hired.  Defendant told Plaintiff this was only temporary while she was out on medical leave.

22.  Plaintiff's doctor signed a release permitting Plaintiff to return to work on April 6, 2009.  After Plaintiff return[ed] to work, the other employee remained in the front end manager position. The other employee also earned $1.10  more per hour than Plaintiff and received part of Plaintiff's bonus

4

Case No. 8:10-CV-1987-T-17TGW

checks.

23.  In or around September, 2009, Defendant told Plaintiff the following day she was to report to another store 25 miles away from the store at which she currently worked.  Plaintiff told Defendant this would cause a hardship due to her bladder disorder.  Plaintiff requested other options, including working as a cashier or bagger so that she could remain at her current store but she was not permitted to do so.

24.  Plaintiff was told the HR manager would call her the next day or so.  The HR manager did not call Plaintiff nor did she return Plaintiff's calls.

25.  On or about September 22, 2009, Defendant terminated Plaintiff for not reporting to work at the new location.

5.     Defendant Winn-Dixie Stores, Inc. has had policies and procedures in place to prevent workplace discrimination, including discrimination or harassment based on disability, from 2005 to the present  (Dkt. 14-1, pp. 5-11).   In addition to prohibiting discrimination, Defendant's policies state:

An Associate who believes he or she has been retaliated against as a result of making a complaint or for providing information related to such a complaint must report this matter to our Company....

If for some reason an Associate is not satisfied with our Company's response to a complaint made under this policy, Associates are free to contact our Senior Vice President, Human Resources, located at our Company's Corporate Offices in Jacksonville, Florida at (904) 783-5000 or the "W-DIAL" at 1-877-919-3425.

6.     Defendant Winn-Dixie Stores, Inc. provides an Associate Handbook containing Defendant's policies to prevent workplace discrimination to all employees. (Dkt. 14-1, p. 1, par. 2).

Case No. 8:10-CV-1987-T-17TGW

7.     Plaintiff Myers acknowledged receipt of the Associate Handbook which contains Defendant's policy against discrimination and harassment (Dkt. 14-1, pp. 3-4) on November 11, 2008 (Dkt. 14-4, p. 17).

8.     The Associate Handbook includes Defendant's Progressive Discipline Process, and includes notice that violations of certain rules are considered serious and may result in immediate termination, including fighting, stealing or mishandling Company funds, falsifying or manipulating Company information, insubordination, abandoning your job, destroying or misusing Company property, failing to comply with local, state and federal laws, possessing a weapon or firearm on Company premises, and inappropriate conduct.  (Dkt. 14-1, p. 4).

9.     In her deposition, Plaintiff Myers testified that she became aware of the "Open Door" policy in 2006, and at that time began to talk to Renee Peterson (District Human Resource Specialist) about Plaintiff's issues.  (Dkt. 14-2, p. 26).   Plaintiff Myers testified that Plaintiff spoke with Renee Peterson between 20 and 50 times about concerns Plaintiff had with problems and harassment.   (Dkt. 14-2, p. 31).

10.     In her deposition, Plaintiff Myers testified that she met with Renee Peterson and Melissa Kunz (Head of Security) in June, 2008 at the Olive Garden to communicate the following complaints (Dkt. 14-2, pp. 41-52):   a). Plaintiff's request to use a walker was  denied on one occasion; b) Plaintiff was told not to apply for the  center store specialist job; c) Plaintiff had doctor's notes stating Plaintiff periodically had to sit down, but Kevin Mathis (Store Director) or Mike Howard (Assistant Manager) told Plaintiff to get up and get back to work; d) Mike Howard called Plaintiff a "druggie"; e) Mike Howard made many comments that Plaintiff's eyes looked glassy and Plaintiff looked "fucked up"; f) Sandra Fawcett and April Butler did not allow Plaintiff access to their paperwork, and Kevin Mathis permitted this;  g) any time Plaintiff had an infection, Mike Howard and Kevin Mathis would fling their hands up in the air and say "you're sick again".

6

Case No. 8:10-CV-1987-T-17TGW

11.    In her deposition, Plaintiff Myers testified that she met with Renee
Peterson at the Olive Garden in December, 2008, which included discussion of the
issues raised in the June, 2008 meeting, and also  whether Kevin Mathis was stealing
from Defendant.   (Dkt. 14-2, pp. 65-67).    Plaintiff Myers testified that Renee Peterson
told Plaintiff that she (Renee Peterson) would "fix things, things will be right, not to worry
about things.  You won't be harassed anymore.  You won't be treated badly anymore."
(Dkt. 14-2, p. 67).    Plaintiff Myers further testified that Renee Peterson told Plaintiff
that if she had to go out on a leave of absence, to make sure that it is done as an
intermittent leave of absence.    (Dkt. 14-2, p. 67).

12.   Plaintiff Myers testified that when she gave Michael Howard Plaintiff's
doctor's release to return to work in April, 2009,  Michael Howard notified Plaintiff that
Plaintiff had to meet with Renee Peterson before returning to work.    Plaintiff Myers
testified that Michael Howard called Renee Peterson while Plaintiff was present (Dkt.
14-2, p. 78).    Plaintiff was not put on the schedule until after Plaintiff telephoned
Fidencio Alexander (District Customer Service Specialist).   (Dkt. 14-2, p. 79).

13.   Plaintiff Myers testified that her performance reviews after Plaintiff returned
from FMLA leave in April, 2009 were like her performance reviews prior to Plaintiff's
leave; sometimes the evaluation was favorable, and sometimes the evaluation was less
favorable and various issues needed improvement, as indicated by fluctuating
"numbers" that went up and went down. (Dkt. 14-3, pp. 26-28).

14.   Plaintiff Myers testified that her doctor placed one restriction on Plaintiff's
return to work in April, 2009, that Plaintiff periodically had to sit down.  Plaintiff Myers
also testified that Plaintiff never returned to her doctor to obtain any additional restriction
on Plaintiff's work, and Plaintiff never provided anything to Defendant concerning
additional restrictions on Plaintiff's work.  (Dkt. 14-2, pp. 73-74).

Case No. 8:10-CV-1987-T-17TGW

15.  Plaintiff Myers testified that after April, 2009, other managers would not speak to her without a witness present.  (Dkt. 14-3, pp. 79-81).

16.   Fidencio Alexander (District Customer Service Specialist) and Mark Sheppherd (Store Director) met with Plaintiff on September 9, 2009 and notified Plaintiff Myers that Plaintiff was being transferred to the Pinellas Park store.  At that time, Plaintiff Myers told them that the Pinellas Park store was too far for Plaintiff to travel because of Plaintiff's damaged kidney and resulting pain, and because Plaintiff could not be that far away from Plaintiff's doctor.   Plaintiff Myers later learned that the Pinellas Park store did not have a pharmacy.   (Dkt. 14-3, pp. 58-65).   Plaintiff further asked to remain at the Holiday store as a bagger or cashier.

17.  Plaintiff Myers denied knowing that, based on Plaintiff's status as a management employee, Defendant could transfer Plaintiff to any store within a radius of twenty-five miles of Plaintiff's assigned store.  (Dkt. 14-3, p. 56).   Plaintiff Myers acknowledged that employees could be transferred.  Plaintiff Myers testified that Roberto Gonzalez (District Manager) made up the twenty-five mile geographical limit. (Dkt. 14-3, p. 56).

18.   Plaintiff Myers attended an appointment with her doctor on September 11, 2009, but did not request a doctor's note verifying that Plaintiff Myers could not travel to Pinellas Park due to Plaintiff's medical condition.   (Dkt. 14-3, pp. 67-68).

19.    Plaintiff Myers testified that Renee Peterson did not contact her and the Pinellas Park store manager did not contact her after the September 9, 2009 meeting, and therefore Plaintiff Myers did not return to her doctor and obtain documentation of Plaintiff's alleged restriction on travel    (Dkt. 14-3, p. 69).

20.   Plaintiff Myers testified that she called Renee Peterson, HR Specialist, on

8

Case No. 8:10-CV-1987-T-17TGW

9/10/2009, but did not leave a message; Plaintiff also called Renee Peterson's cell phone two more times, but Renee Peterson's voicemail was full.  Plaintiff Myers testified that Plaintiff called the Winn-Dixie hotline to seek additional guidance, and information was taken as to this phone call.  However, no one called Plaintiff to discuss Plaintiff's situation.  (Dkt. 14-3, pp. 75-76).

21.    After Defendant directed Plaintiff to report to the Pinellas Park store 25 miles away, and after Plaintiff requested to remain at the Holiday store as a bagger or cashier, which Defendant did not permit,  Plaintiff's husband spoke with Defendant's corporate representatives, and asked Defendant to terminate Plaintiff, so Plaintiff could be added to his insurance plan.  (Dkt. 14-3, pp. 79-82).

22.    Angelika Koutsoilias (Head In-Store Coordinator) testified in her deposition that Michael Howard (Assistant Manager) told her that Plaintiff caused too much drama, and it would be better if Plaintiff wasn't there. (Dkt. 18, p. 4), but denied that Michael Howard said that Plaintiff had too many health issues.   She testified that, in her opinion, management thought Plaintiff was missing too much work.  (Dkt. 18, p. 4).   Angelika Koutsoilias testified that she heard Kevin Mathis and Michael Howard speak in an annoyed tone of voice on multiple occasions about Plaintiff's absences.  (Dkt. 18, p. 4). She further testified that Kevin Mathis told her that Roberto Gonzalez pressured him to "take care of the problem," either replace Plaintiff or fire Plaintiff., (Dkt. 18, p. 5), and Kevin Mathis either had to fire Plaintiff, or Kevin Mathis would be fired.  (Dk. 18, p. 5). She testified that Kevin Mathis said on many occasions, before and during Plaintiff's leave of absence, that he was pressured "to get rid of Plaintiff" because "[S]he's too much drama."  (Dkt.  18, p. 8).   She testified that if Plaintiff saw Kevin Mathis or Michael Howard doing something that was not "by the book," Plaintiff would tell upper management.  (Dkt. 18, p. 8).

23.  Angelika Koutsoilias also testified that Ewa Roeser was hired when Plaintiff

Case No. 8:10-CV-1987-T-17TGW

was on leave and the store was being remodeled to "take the stress off everything."
(Dkt. 18, p. 3).    She testified that she spoke with Kevin Mathis about considering her
(Angelika Koutsoilias) for a temporary front-end manager position while Plaintiff was on
leave, but due to her school schedule, Kevin Mathis told her it would not work.  (Dkt. 18,
 p. 7).   She further testified that Kevin Mathis told her he was thinking about bringing in
Ewa Roeser, but did not think it would be permanent. (Dkt. 18, p. 7).    Angelika
Koutsoilias testified that when Plaintiff returned from her leave, Plaintiff and Ewa Roeser
were running the store together, splitting the tasks, for a month, but, in her opinion,
"their brains [didn't] work together," (Dkt.  18, p. 7),   each had their own set routine.


    24.    According to Plaintiff, the day that Plaintiff returned to work, Ewa Roeser
had a discussion with Plaintiff in which Ewa Roeser  specifically told Plaintiff that she
(Plaintiff) was the front-end manager, and that Ewa Roeser "did not want to step on
anyone's toes."  (Dkt. 14-4, pp. 22-24).


    25.  Kevin Mathis was fired due to an inventory shortage.  (Dkt. 17-1, p. 5).


    26.  Melissa Kunz (Head of Security) testified in her deposition that Kevin Mathis
and Michael Howard had abrasive personalities, and were sarcastic to employees (Dkt.
19, p.  5).   She further testified that Kevin Mathis and Michael Howard were
"screamers," but Michael Howard was less so; their standard m.o. was to "scream" at
employees if work was not done as they directed. (Dkt. 19, pp. 9-10).    In her opinion,
Kevin Mathis had a habit of making inappropriate comments.  (Dkt. 19, p. 6, Depo. p.
23).  Melissa Kunz further testified that their general tone was one of annoyance when
speaking of Plaintiff's absences, or of changing the work schedule due to Plaintiff's
absences.  (Dkt. 19, p. 10).  Melissa Kunz denied that Kevin Mathis and Michael
Howard made specific negative comments about Plaintiff's absences.  (Dkt. 19, p. 10).


    27.  Plaintiff's Charge of Discrimination was received by the EEOC on

Case No. 8:10-CV-1987-T-17TGW

November 9, 2009.  In the Charge, Plaintiff includes factual allegations spanning 2004 through 2009.  Plaintiff alleged that Plaintiff was terminated due to disability or perceived disability in 2009.  The Court also understands Plaintiff to allege the following acts of discrimination: 1) Plaintiff was discouraged from applying for a promotion in 2007; 2) managers made fun of the way Plaintiff walked in September 2008, and after Plaintiff complained to HR, nothing was done to stop it; 3) managers ordered 2X clothes to make fun of Plaintiff in November, 2008;    4) while Plaintiff was out on FML leave related to Plaintiff's disability, management replaced Plaintiff at the Holiday store by another employee without front-end manager experience, and upon Plaintiff's return to work, continued to employ the other employee, and paid the other employee more than Plaintiff;  5) before Plaintiff's return to work on April 6, 2009, Plaintiff was told that the managers would need to discuss Plaintiff's return before permitting Plaintiff to return, which was approved; 6) while Plaintiff was out on FML leave, the Store Director was replaced, and the new Store Director changed Plaintiff's scheduled days off, which Plaintiff told Defendant created a hardship for Plaintiff's scheduled doctor appointments, so that Plaintiff began scheduling doctor appointments on Plaintiff's lunch break, so as not to miss work; 7) Plaintiff was told to report to the Pinellas Park Store (25 miles away) for work the next day in September, 2009 but Plaintiff told the manager Plaintiff could not travel that far from home due to doctor's appointments.  Plaintiff asked for another option to remain at the Holiday store, but Plaintiff was told to go to the Pinellas Park store because nobody else wanted it, and that the Human Resources Manger would call Plaintiff.  The Human Resources Manager did not call Plaintiff and did not return Plaintiff's calls; 8) Plaintiff was told Plaintiff was terminated on September 22, 2009.    The "Respondent's Reason for Adverse Action" was "Not reporting to work."

28.    Plaintiff filed suit in Pasco County Circuit Court on August 18, 2010. Plaintiff's case was removed to the Middle District of Florida on September 9, 2010.

III.    Discussion

11

Case No. 8:10-CV-1987-T-17TGW

In the Complaint, Plaintiff Myers alleges Defendant discriminated against Plaintiff on account of her known disability, and/or because Defendant regarded Plaintiff as having a disability, and/or because of Plaintiff's record of having a disability, in violation of the ADA.

Defendant Winn-Dixie Stores, Inc. seeks entry of summary judgment to the extent that Plaintiff Myers seeks recovery for alleged acts of discrimination that took place more than 300 days before Plaintiff filed her discrimination charge, or before January 13, 2009.   Defendant seeks summary judgment as to alleged acts of discrimination from 2004 through December, 2008 (Dkt. 14, pp. 5-8, pars. 14-24).

Defendant Winn-Dixie Stores, Inc. seeks summary judgment on Plaintiff's claims under the Florida Civil Rights Act ("FCRA") to the extent Plaintiff seeks recovery for alleged acts that took place more than 365 days before Plaintiff filed her discrimination charge, or before November 9, 2008.

Defendant Winn-Dixie Stores, Inc. seeks summary judgment with respect to Plaintiff's claim that is based on the harassment theory, i.e. hostile work environment, because the conduct Plaintiff alleges in her Complaint and deposition is not sufficiently severe or pervasive to give rise to liability under the ADA or FCRA.

Defendant Winn-Dixie Stores, Inc. seeks summary judgment as to an award of punitive damages in Plaintiff's FCRA claims. Defendant Winn-Dixie argues: 1) there is no evidence to establish the malicious or reckless indifference necessary to support a punitive damages claim; and 2) Defendant Winn-Dixie maintained a written non-discrimination policy to prevent discrimination in the workplace and has implemented the policy through education and enforcement in a good faith effort to comply with the law.

Case No. 8:10-CV-1987-T-17TGW

Plaintiff Myers responds that Plaintiff has presented sufficient evidence to create a triable issue as to Plaintiff's hostile work environment claims, and the issue of punitive damages should be deferred.

A. Preliminary Issues

1. ADAAA

In an ADA complaint premised on circumstantial evidence, the Court applies the McDonnell Douglas framework, with its shifting burdens.   The Court notes that the ADA Amendments Act of 2008 ("ADAAA")  became effective on January 1, 2009.  Inter alia, the ADAAA broadened the definition of disability, and provides that whether a disability substantially limits a major life activity is a decision made without regard to the ameliorative effects of mitigating measures.  Under the ADAAA, whether or not an impairment substantially limits a major life activity is no longer relevant to the "regards as" test.  An employer is deemed to have regarded the individual as having a disability if it makes an adverse decision based on an employer's belief that the employee has an impairment.

The Court notes that Plaintiff is proceeding to jury trial on Plaintiff's "failure to accommodate" theory.  The pending motion addresses Plaintiff's hostile work environment claim, among other issues.    A hostile work environment claim encompasses a series of events over a period of time, and the Court considers the totality of the circumstances in determining whether objective severity or pervasiveness is present.  Some of the events which the Court understands to be included in Plaintiff's hostile work environment claim occurred prior to the effective date of the ADAAA and some occurred after the effective date.   The ADAAA is not applied retroactively.  The ADA in effect at the time of the alleged discrimination controls.   See Fikes v. Wal-Mart, Inc., 322 Fed. Appx 882 (11th Cir. 2009).

13

Case No. 8:10-CV-1987-T-17TGW

2.   Alternative Theories of Employer Liability

In <u>Hulsey v. Pride Restaurants, LLC</u>, 367 F.3d 1238 (11th Cir. 2004)(a sexual harassment case), the Eleventh Circuit explains that discriminatory harassment can alter the terms, conditions and privileges of employment in two ways; one way is through a tangible employment action against the employee, "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  The employer is liable when it permits a supervisor to take a tangible employment action against an employee because the employee refused to give in to a supervisor's sexual overtures, regardless of whether the employee took advantage of an employer's system for reporting harassment.  The second way for discriminatory harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change in the terms and conditions of employment, even through the employee is not discharged, demoted or reassigned.  An employer may escape liability for a hostile environment by establishing as an affirmative defense that the employee failed to take prompt advantage of the employer's system for reporting and preventing harassment.

Tangible employment action and hostile work environment are two alternative ways to establish an employer's vicarious liability for discriminatory conduct of supervisory employees.